# FORM   A

CIVIL RIGHTS COMPLAINT TO BE USED BY A *PRO SE* PRISONER
UNDER 42 U.S.C. § 1983 or
Rev. 10/10     UNDER *BIVENS V. SIX UNKNOWN FED. NARCOTICS AGENTS*

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY

> **FILED**
>
> JAMES J. VILT JR., CLERK
> U.S. DISTRICT COURT
> W/D OF KENTUCKY
>
> Date: _____ Apr 05, 2023 _____

BRIAN DAWSON SMITH
_____

_____

_____

(Full name of the Plaintiff(s) in this action)

v.     CIVIL ACTION NO. ___1:23CV-45-GNS___
     (To be supplied by the clerk)

Warren County
_____

Stephen Harmon
_____

John or Jone Doe (One)     ( ) DEMAND FOR JURY TRIAL
_____

John or Jone Doe (Two)     (X) NO JURY TRIAL DEMAND
_____            (Check only one)

~~John or Jone Doe (Three)~~
_____

(Full name of the Defendant(s) in this action)
~~John or Jone Doe (Four)~~

## I.     PARTIES

(A) **Plaintiff(s)**. Place the full name of the Plaintiff in the first blank below, his/her place of confinement, address, and status. Repeat this procedure for each additional Plaintiff named, if any.

(1) Name of Plaintiff: BRIAN DAWSON Smith

Place of Confinement: Davidson County Sheriff Office, Downtown Detention Center

Address: Brian D Smith, 261656/PO Box 196383/Noshville, TN 37219

Status of Plaintiff: CONVICTED (X) [STATE] PRETRIAL DETAINEE ( ) [Federal]

(2) Name of Plaintiff: _____

Place of Confinement: _____

Inmate# 261656

Address: _____

Status of Plaintiff: CONVICTED (___) PRETRIAL DETAINEE (___)

(3) Name of Plaintiff: _____

Place of Confinement: _____

Address: _____

Status of Plaintiff: CONVICTED (___) PRETRIAL DETAINEE (___)

**(B) Defendant(s)**. Place the full name of the Defendant in the first blank below, his/her official position title in the second blank, and his/her place of employment in the third blank. Mark the capacity in which the Defendant is being sued. Repeat this procedure for each additional Defendant named, if any.

(1) Defendant _Stephen       Harmon_____ is employed

as _Jailer_____ at _Warren County Regional Jail_____.

The Defendant is being sued in his/her ( X ) individual and/or ( X ) official capacity.

(2) Defendant _John or Jone Doe (One)_____ is employed

as _____ at _Warren County Regional Jail____.

The Defendant is being sued in his/her ( X ) individual and/or (___) official capacity.

(3) Defendant _John or Jone Doe (Two)_____ is employed

as _Front Office/Mailroom_____ at _Warren County Regional Jail___.

The Defendant is being sued in his/her ( X ) individual and/or (___) official capacity.

(4) Defendant _____ is employed

as _____ at _Warren County Regional Jail____.

The Defendant is being sued in his/her (___) individual and/or (___) official capacity.

2

(5) Defendant _____ is employed

as _____ at _____.

The Defendant is being sued in his/her (___) individual and/or (___) official capacity.

## II.    PREVIOUS LAWSUITS

(A) Have you begun other lawsuits in State or Federal court dealing with the <u>same facts</u> involved in this action?  YES (___) NO (X)

(B) If your answer to "A" is YES, describe the lawsuit in the spaces below. If there is more than one lawsuit, you must describe the additional lawsuits on another sheet of paper, using the same outline.

Parties to the previous lawsuit:

Plaintiff(s):    _____

_____

Defendant(s):    _____

_____

Court (if federal court, name the district.  If state court, name the county):

_____

Docket number: _____

Name of judge to whom the case was assigned: _____

Type of case (for example, habeas corpus or civil rights action): _____

Disposition (for example, Was the case dismissed?  Is it still pending?  Is it on appeal?):

_____

Approximate date of filing lawsuit: _____

Approximate date of disposition: _____

3

## III.    STATEMENT OF CLAIM(S)

State here the FACTS of your case.  State how you believe your constitutional rights were violated.  Describe how each Defendant violated your rights.  And set forth the dates on which each event took place.  Do not make legal arguments or cite cases or statutes.   However, identify the constitutional right(s) you allege was/were violated.  If you intend to assert multiple claims, number and set forth each claim in separate paragraphs.

1   At all times relevant to the Court's consideration, Plaintiff was a pretrial detainee at Warren County Regional Jail, located at 920 Kentucky St. Bowling Green, Kentucky, 42101.

2   Due to an inability, otherwise, to present and litigate this claim and due to extraordinary circumstances, described in detail in Plaintiff's Motion for Equitable and Statutory tolling, Plaintiff needs Discovery immediately to Re-discover the identities of John and/or Jane Doe defendants and to recover or replace previously collected evidence of dates, actions and communications. Plaintiff is untrained in the law, is currently unsure how to start the Discovery process and requests the Court's indulgence and instruction.

3   Due to the need for such Discovery as detailed in paragraph 2, as well as the continuing difficulties Plaintiff is currently experiencing in communicating with the Court, Plaintiff respectfully requests that the Court request the Clerk of the Court to preemptively place the instant case number and the word "Amended" on a new Section 1983 Complaint form and to send it to Plaintiff along with an adequate number of summons forms and exhibit labels for Plaintiff's use in an amended complaint.

### III. STATEMENT OF CLAIM(S) continued

4 Plaintiff is currently proceeding Pro se.

5 Jurisdiction is granted pursuant to 28 U.S.C.S.1331, 28 U.S.C.S.1343, and 28 U.SC.S.2201 and 28 U.SC.S.2202. Supplemental jurisdiction over Kentucky State law claims is pursuant to 28 U.S.C.S 1367

6 All claims in this complaint have been fully exhausted thru the Warren County Regional Jail grievance process except where that process was made unavailable due to transfer of the Plaintiff to Davidson County Sheriff Office, Downtown Detention Center.

7 Neither official WCRJ prisoner rules and regulations nor any unofficial promulgated and announced WCRJ policy in effect during any part of Plaintiff's residence at WCRJ specified how legal mail and/or privileged mail should be marked to receive special treatment as legal or privileged mail.

8 All claims in this complaint are believed by Plaintiff to be within the statute of limitations for the Commonwealth of Kentucky as of the writing of this statement. Where additional instances possibly outside the normal time period for the statute of limitations are discussed, it will be noted.

9 Count Category One (CC1)

Under color of state law and in blatant disregard of Plaintiff's constitutional rights under the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution, the Privileges and Immunities Clause of Article IV of the United States Constitution, and as well of the Constitution of the Commonwealth of Kentucky and the common law right to privacy and all applicable Kentucky law, such as, but not limited to, 501 KAR 3:140 et seq "Prisoner Rights", and its originating and related statutes, which codifys a state-created liberty interest rising to the level of a Federally-protected liberty interest, at least six (6) pieces of proper ly and clearly marked legal mail, addressed to Plaintiff, were arbitrarily and capriciously opened without Plaintiff's presence and outside Plaintiff's cell.

10 Due to the duty owed Plaintiff by the jails employees under 501 KAR 3:140 et seq and its originating and related statutes and also inherent in their position as jail employees, and the resultant irreparable harm done Plaintiff by these employees violating these same Regulations and statutes (and referencing the additional ignoring of Plaintiff's common law right to privacy and Federal constitutional rights) Plaintiff additionally claims negligence by employees who opened this mail outside Plaintiff's presence, John or Jane Doe One, John or Jane Doe Two and Stephen Harmon.

11 Additionally, as jail employees are public servants, and the opening of these letters outside Plaintiff's presence violated the laws and rights in paragraph ten (10), the Count Category One acts were a violation of KRS 522.020(b),(c) and KRS 522.030(b),(c) and thus a claim is additionally made under KRS 446.070.

against John or Jane Doe One, John or Jane Doe Two and Jailer Stephen Harmon.

12. Letters One (1) and Two (2) were from Plaintiff's civil attorney AVA Law and concerned a highly-personal and sensitive civil matter which also had information in common with Plaintiff's two criminal cases. These two letters were marked with the law firm's name and information in the return address area and were properly and clearly marked, additionally, as legal mail. These two letters were opened without Plaintiff's presence and then read- after letter One had been held for about a thirty (30) day period- by John or Jane Doe One, who initialed an entry for the letters One and Two on Plaintiff's property log.

13 Letter Three (3) was a response from a paralegal firm "Elite Paralegal Services," which Plaintiff had contacted intending to use to help him in both his civil and criminal cases. Plaintiff had yet to have a state criminal attorney assigned, as well and was hoping the paralegal firm could help Plaintiff in ways the Plaintiff could not help himself, in his disadvantaged communications position. Letter Three was opened by John or Jane Doe Two without Plaintiff's presence, and is believed to work in the WCRJ Front Office Mailroom. This letter was properly and clearly marked as legal mail with the words "legal mail" written on both the front and the back of the envelope. (Letter Three will also appear in Count Category Three)

14 Letter Four (4) was from a civil rights organization which offers multiple services to prisoners and formen prisoners, including direct advocacy and legal advice, was properly and clearly marked as originating from that organization, and was opened outside Plaintiff's presence by a John or Jane Doe Two  who Plaintiff believes works in the WCRJ Mailroom. (The organization name is believed to be The Fortune Society.)

15 Letter Five (5) was From a national legal aid organization, from which Plaintiff had wanted to get legal advice and/or legal representation from, on both criminal cases, Plaintiff's civil case and an anticipated civil case, and it contained a "decline to represent." This letter was properly and clearly marked as originating from a legal aid organization and thus was properly and clearly marked as legal mail. This letter was opened by John or Jane Doe Two.

16 Letter Six (6) was properly and clearly marked as legal mail and was from a legal aid organization in Memphis Tennessee and contained a decline to represent letter. Plaintiff had written this organization to obtain counsel For a case involving a petition which had been Filed to Find Plaintiff's children dependent and/or neglected — an action which, under local Tennessee law (For instance Tennessee Supreme Court Rule 13 (1)(d)(2)(8), also Smith v. Edmiston, 942, 945 431 F. Supp 941 (W.D. Tenn. 1977)). Plaintiff should have been appointed counsel to represent him after his timely sent request, but mysteriously now appears not to have been.

17 It is worth noting here, that, despite Plaintiff's sending of at least half a dozen timely-sent motions, affidavits, petition responses, a request and motion for participation and for a court response and the motion for counsel, Plaintiff to this date has never received any communication from the Memphis court while Plaintiff was at WCRJ and no communication at all from any party to the case - except the original service. Plaintiff believed - and continues to believe - that this information 'blackhole' has been due to delay or destruction and the resulting non-receipt or untimely-receipt of Plaintiff's outgoing court mail at WCRJ.

18. Letter Six was properly and clearly marked as legal mail from a legal aid organization, and contained a letter containing one side of a discussion between Plaintiff and a legal aid organization about attorney representation. Letter Six was opened outside Plaintiff's presence by WCRJ Jailer Stephen Harmon, who directly participated in this unconstitutional and recklessly negligent conduct. Plaintiff believes Jailer Harmon additionally participated in other instances of personally opening clearly and properly marked legal and privileged mail outside the presence of addressee pretrial detainees and other prisoners, including that of Plaintiff.

19. Jailer Harmon was not only aware of legal mail and privileged mail from public officials being opened outside the presence of prisoner addressees – including Plaintiff's listed letters in Count Categories One and Two–simply because they were arbitrarily deemed to not be from an "attorney of record" but Jailer Harmon also ratified and enforced these actions in his official and personal capacities as official Warren County Policy, as can be seen in Jailer Harmon's Responses to Plaintiff's grievance appeals.

20. In direct opposition to clearly established Sixth Circuit case law and in arbitrary and capricious violation of the First, Fourth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as the Privileges and Immunities Clause of Article IV of the United States Constitution and the Constitution of the Commonwealth of Kentucky and of Kentucky regulations and statutes concerning Kentucky jails and jailers duties, such as 501 KAR 3:140 et seq and its originating and related statutes, which require all Jailers to maintain current knowledge of case law and legal holdings related to jails and prisons and therefore in a violation of KRS 522.020(b)(c) and KRS 522.030(b)(c) giving rise to a claim Plaintiff additionally makes under KRS 446.070, and negligence, as well as common law and Kentucky Commonwealth rights to privacy, Jailer Harmon, in his official capacity as the

20 (Continued from previous page)

Final decision maker for WCRJ, and in his individual capacity recklessly, unconstitutionally, unlawfully and knowingly maintained, continued, promulgated and enforced a WCRJ and Warren County policy, practice and custom of only granting "legal mail" status, and the required special handling of such mail, to mail from whomever jail employees arbitrarily determined was an "attorney of record", which caused the intentional deprivation of Plaintiff's constitutional rights. By the opening of Plaintiff's legal and protected privileged mail outside Plaintiff's presence, both listed and unlisted in Count Categories One and Two, by Jailer Harmon and John or Jane Doe WCRJ employees. This was done under color of state law.

21 In the case of Letters One and Two, these letters were properly and clearly marked as being legal mail from the attorney and law firm already representing Plaintiff in his intimately personal and distressing civil action and these letters were thus even from an "attorney of record." Plaintiff was not asked if this was his "attorney of record. Plaintiff asserts that a call was placed to the United States Marshal to ask them if this was Plaintiff's "attorney of record." This was an incomplete investigation and it would have been a deminimis cost to simply ask Plaintiff at the next mail call.

22 This Warren County policy, promulgated by Jailer Harmon in his official capacity as WCRJ Jailer, does not safeguard sensitive and confidential privileged and/or legal mail not from a known "attorney of record", yet the cost of changing this policy would be deminimis, since the mail could simply be opened and searched (or the letter copied and the original shredded as is currently being done as a newly-enacted

22 (continued from previous page)

practice for "attorney of record" mail at the jail) by jail employees at mail call in front of the prisoner addressee.

23 Count Category Two (CC2)

Under color of state law and in blatant disregard of Plaintiff's constitutional rights under the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution, the Privileges and Immunities Clause of Article IV of the United States Constitution, and as well as of the Constitution of the Commonwealth of Kentucky, the common law right to privacy and all applicable Kentucky Commonwealth law, such as, but not limited to 501 KAR 3:140 et seq "Prisoner Rights" and its originating and related statutes, (and specifically Section 2 "Mail" of 501 KAR 3:140 et seq) which codifys a state-created liberty interest right rising to the level of a Federally protected liberty interest, at least eight (8) pieces of properly and clearly marked privileged mail from public officials, addressed to Plaintiff, were arbitrarily and capriciously opened without Plaintiff's presence and outside Plaintiff's cell.

24 Due to the duty owed Plaintiff by the jail's employees under 501 KAR 3:140 et seq and its originating statutes and also inherent in their positions as jail employees, and the resultant irreparable harm done Plaintiff by these employees violating these same regulations and statutes, (and referencing the additional violating of Plaintiff's common law right to privacy and Federal and Kentucky constitutional rights) Plaintiff additionally claims negligence by the employee who opened this mail outside Plaintiff's presence, John or Jane Doe Two.

25 Additionally, as jail employees are public servants, and the opening of the Count Category Two letters outside Plaintiffs presence violated the laws and rights listed in paragraph twenty-four (24), the Count Category Two acts were a violation of KRS 522.020(b),(c) and KRS 522.030 (b),(c) and this a claim is additionally made under KRS 446.070 against John or Jane Doe Two.

26 Letters seven thru thirteen were properly and clearly marked with the return address and name of a public official. Mail from a "public official" is required by 501 KAR 3:140 et seq to be opened in the presence of the prisoner addressee. "Public officials" include, but are not limited to, public officials, entities and agencies of the executive branch of federal, state or local government as well as elected officials.

27 Letter Seven (7) from the Internal Revenue Service, letter Eight (8) from the Social Security Administration, letter Nine (9) from Nelnet and letters Ten (10), Eleven (11), Twelve (12) and Thirteen (13) from the Kentucky Department of Libraries and Archives were opened without Plaintiff's presence and outside his cell by John or Jane Doe Two.

28 Letters Twelve and Thirteen were written to the Department of Libraries in an attempt to do research for Plaintiff's criminal and pro se Memphis civil case and, due to their case-related nature, would have imported on unfair advantage to the prosecution were even the topics revealed — whether or not the information, itself, was publically available, and may also qualify as legal mail.

29 It is worth noting here, that the Department of Libraries and Archives maintains and provides access to historical legal information in the form

29 (continued from previous page)
of law books, historical cases, historical legal journal articles, and many other resources for criminal and civil rights law for the People of the Commonwealth of Kentucky - including its prisoners.

30 The Department of Libraries and Archives of the Kentucky Commonwealth additionally provides these resources by mail to potentially underserved areas of and facilities inside Kentucky and has an agreement to follow a set of pre-determined Kentucky Department of Corrections (D.O.C.) Requirements as to what must be censored due to penological needs of the D.O.C. If a document can not be sent, a box is checked on the "Archives Cover Sheet" and the prisoner will not get the requested information.

31 It was an arbitrarily, capricious, excessive reaction to open letters Seven thru Thirteen outside Plaintiff's presence since then would have taken the same amount of time to open and search in Plaintiff's presence at mail call. Additionally these privileged letters are required to be treated the same as "legal mail" by 501 KAR 3:140 et seq. Prisoner Rights and its originating statutes.

32 Jailer Harmon was not only aware of the 501 KAR 3:140 et seq and related and originating statutes' prohibition against opening mail from public officials outside the presence of the addressee prisoners not being honored by WCRJ employees (Court Category Two), but Jailer Harmon ratified and enforced these actions as official Warren County policy and practice, in both his official and personal capacities, as can be seen in Jailer Harmon's responses to Plaintiff's grievance appeals.

www.madisonpaper.com

www.madisonpaper.com

33 Under color of state law and in arbitrary and capricious violation of the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution as well as the Privileges and Immunities Clause of Article IV of the United States Constitution and the Constitution of the Commonwealth of Kentucky and of Kentucky regulations and statutes concerning Kentucky jails and jailers duties, such as 501 KAR 3:140 and its originating and related statutes which require local jail facilities and jailers to treat mail from public officials as privileged mail and with the same special treatment legal mail receives by being opened in the presence of the prisoner addressee and therefore in violation of KRS 522.020(b)(c) and KRS 522.030(b)(c) giving rise to a personal capacity claim Plaintiff additionally makes under KRS 446.070, and negligence as well as under the common law right to privacy and Kentucky Commonwealth rights to privacy. Jailer Hormon, in his official capacity as the final decision maker for WCRJ and in his individual capacity recklessly, unconstitutionally, unlawfully and knowingly maintained, continued, promulgated and enforced a WCRJ and Warren County policy, practice and custom of not granting mail from public officials a privileged mail status and of not opening mail from public officials in front of the prisoner addressee, which caused the intentional deprivation of Plaintiff's constitutional rights thru the opening of Plaintiff's privileged mail from public officials outside Plaintiff's presence, both listed and unlisted in Count Category Two by John or Jane Doe WCRJ employees.

34 When Plaintiff arrived at WCRJ, Plaintiff expected the types of communication in Count Categories One and Two to be private and he sought to preserve them as private by filing grievances, marking any outgoing legal mail

34 (continued from previous page)

with at least the words "legal mail" on the front and back of any envelope containing it, and by requesting that any organizations and individuals with whom Plaintiff attempted to converse privately about legal matters, do the same. Plaintiff continued this practice even after his legal mail had been opened outside his presence anyway.

35 Plaintiff additionally sought alternative means of securing private legal conversations by requesting that the jail add the two phone numbers for Plaintiff's Federal criminal attorney and the national numbers for two nationally-known civil rights organizations, which do provide direct legal representation, to the Securus (WCRJ's phone system) list of non-recorded numbers. This grievance appeal was answered by Jailer Hormon, who refused to add the phone numbers and who said that the phone numbers would have to be added by the attorney. Plaintiff did not yet have a way to contact either the ACLU or the Southern Poverty Law Center at that time and had not yet acquired an attorney from either of these groups. Plaintiff asserts that his privacy interest in having a non-recorded conversation with his attorney is as great or greater than the attorney's interest, certainly since it was Plaintiff who was attempting to make contact. Plaintiff additionally notes that calls to the Federal Public Defenders office are non-recorded by Securus, and that Plaintiff's attorney was not at that office.

36 Additionally, Plaintiff had no privacy on the phones as they were located in Plaintiff's cell, which housed as many as twenty-six (26)

36 (continued from previous page)

prisoners in a cell with bunk beds for seventeen (17). Plaintiff noted that it appeared that bunk beds for two or three prisoners had been added since original construction of the jail and that the original occupancy based on the cell square footage would indicate a figure of fourteen or fifteen based on jail standards. At times prisoners would be sleeping during the times the phones were on, directly under the phone, and there was no time that a prisoner could have a private call due to the cell acoustics and the proximity of the phones to other prisoners.

37 Although calls could eventually be made, by request, from the booking phone near the booking desk—a process that once took Plaintiff almost three months—a person calling on that phone had even less privacy, as both prisoners and WCRJ employees were typically within ten or less feet from the phone and often officers from other agencies of the law would be in and near the room. Plaintiff was told by staff that this phone was also recorded. Thus, the only other method of contacting attorneys who were not physically present at the jail was also an unavailable way to impart case-related information to them.

38 Not only was there no privacy in the "phone alternative" but it is important to note that the Securus phone system, available during most of the day, is also unavailable to dial the "1-8##" phone numbers commonly used in both government and business, unless such a

38 (continued from previous page)

phone number is added to the list of "dialable" Securus phone numbers. Also, the knowledge that this can be done was not generally known by WCRJ prisoners nor was the knowledge disseminated out to prisoners by WCRJ employees in a significant way. The ability to add a phone number to the list of dialable numbers was also not available in the jail's written prisoner rules and information nor on the Securus kiosk in the cell.

39 Additionally, the Securus phone in the cell would also not allow a prisoner to get thru to any government agency, bank, or any organization which had a computer or non-human answered phone system. This left mail, therefore the sole way to communicate at all effectively with many organizations. Plaintiff also notes that he did not have any family or friends on the outside of WCRJ to help him.

40 Count Category Three (CC3)

Under color of state law and in blatant disregard of Plaintiff's constitutional rights under the First Amendment to the United States Constitution (for example: the right to receive news, the right to associate, and Plaintiff's liberty interest in receiving his mail) and under the Due Process Clause of the Fourteenth Amendment to the United States Constitution (procedural and substantive) and in disregard of Plaintiff's right to receive his mail under the Kentucky Constitution and law, three (3) pieces of Plaintiff's mail was rejected with no notice given to the Plaintiff. Plaintiff believes - but does not know - that such mail was returned to the sender. No party, additionally, had an opportunity to protest the rejection nor any opportunity to appeal the rejection to an impartial third party prior to the letters being returned which resulted in irreparable harm to

40 (continued from previous page)
Plaintiff's First Amendment rights and Fourteenth Amendment procedural due process rights as well as Plaintiff's rights under the Kentucky Constitution.

41 Additionally, as jail employees are public servants, and the rejection of these letters and the non-notice of the rejection with no ability to protest or appeal any decision violated Plaintiff's procedural due process rights under the Fourteenth Amendment to the United States Constitution, as well as the Kentucky Constitution and irreparably harmed Plaintiff's First Amendment to the United States Constitution rights, jail employees also violated KRS 522.020(b) and KRS 522.030(b) and thus a claim is made under KRS 446.070 against John or Jane Doe Two

42 Letter Fourteen (14) was the same letter as letter number Three, was from a paralegal firm "Elite Paralegal Services" or "EPS", and was returned to the sender, with no pre-deprivation notice given to the Plaintiff, by John or Jane Doe Two

43 Letters Fifteen (15) and Sixteen (16) were from Plaintiff's bank, Ascend Federal Credit Union, and were returned to the sender, with no pre-deprivation notice given to the Plaintiff, by John or Jane Doe Two.

44 Additional letters were returned without any notice to the Plaintiff, however, discovery will be necessary to ascertain which should be added to this category or excluded.

45 Jailer Harmon was not only aware of mail being returned to sender or destroyed without any pre-deprivation notice being given to the prisoner addressee, including Plaintiffs letters listed in Count Category Three, but Jailer Harmon also ratified and enforced these actions as official Warren County policy in both his official capacity as Jailer and in his personal capacity as can be seen in Jailer Harmon's responses to Plaintiff's grievance appeals.

46 Under color of state law and in arbitrary and capricious violation of the First and Fourteenth Amendments to the United States Constitution and of the Constitution of the Kentucky Commonwealth and therefore in violation of KRS 522.020(d) and KRS 522.030(b) giving rise to a personal capacity claim Plaintiff additionally makes under KRS 446.070, Jailer Harmon, in both his official capacity as the Final decision maker for WCRJ and in his individual capacity, Recklessly, unconstitutionally, unlawfully and knowingly maintained, continued, promulgated and enforced a WCRJ and Warren County policy, practice and custom of returning censored rejected mail with no notice pre-deprivation given to the prisoner addressee, nor was any ability granted therefore to protest the rejection nor to appeal that rejection to an unbiased neutral third party which caused the intentional deprivation of Plaintiff's constitutional rights under the First and Fourteenth Amendments to the United States Constitution and the Constitution of the Kentucky Commonwealth, thru the returning of Plaintiff's rejected censored mail without any notice being given to him predeprivation and also no opportunity to protest the rejection, nor to appeal to a neutral third party.

47. The sending back to sender of rejected censored mail is arbitrary and capricious and demimimis alternatives exist which would protect Plaintiff's constitutional rights. For example, a rejection notice could simply be delivered to the Plaintiff or inmate addressee instead of the rejected letter and an opportunity given to protest the rejection and to appeal the rejection, once notice is given, through the regular grievance process — with the exception that a neutral third party would answer grievance appeals. Alternatively, the jail could simply photocopy the originals and shred the originals as the jail is now doing as a relatively new policy for attorney mail from an "attorney of record."

48. In addition to the policies and customs detailed in Count Categories One, Two and Three, mail of Plaintiff's, properly and clearly marked as legal mail went missing. The amount of mail which did not arrive at the intended addressee was significant. Initially, a letter from Plaintiff to his Federal attorney — in which Plaintiff was asking his attorney to preserve evidence Plaintiff believed was critically important to Plaintiff's Federal case — reportedly never arrived at Plaintiff's attorney's office. Plaintiff had properly and clearly marked this mail as "legal mail" on both the front and back of the envelope and additionally marked the back of the envelope with a message indicating that the communication was "time sensitive." Mail which should have arrived from such reputable sources, after Plaintiff had written them with letters, properly and clearly

48 (continued from previous page)
marked as legal mail — as the Information office of the
United States Supreme Court, The Special Investigations Office of
the United States Justice Department and the American
Civil Liberties Union National Prison Project and additional
civil rights organizations never arrived. Plaintiff had written
these organizations to get information that each organization
offered at no cost, used verified addresses and finds the sheer
number of missing letters compelling — despite not knowing if
the letters Plaintiff wrote to these offices ever arrived there
or if the outgoing mail was intercepted at that point. Plaintiff
believed and believes that a John or Jane Doe Three intercepted
and destroyed Plaintiff's incoming and/or outgoing mail.
Plaintiff also tested an additional letter to his attorney
by sending it to a non-deliverable address, with a correct
return address and an envelope properly and clearly marked
as legal mail. This letter never returned to Plaintiff.

49 Plaintiff mentions this pattern to show additional factors influencing
his distressed, frustrated and distraught state of mind. Other pretrial
detainees had similar disturbing patterns and experiences to those of
Plaintiff. Plaintiff witnessed mail coming to prisoner addressees already open
from such entities as the United States Veterans Administration and even
from the Federal Public Defender's office. The mail from the
Federal Public Defender's office was properly and clearly marked —
it was simply not from the prisoner's attorney of record."

49 (continued from previous page)
(Plaintiff will clarify that he did not see the mail being handed to these other pretrial detonees, but that he saw the mail very soon thereafter, and the prisoners told Plaintiff the mail had been opened outside their presence.

50 Plaintiff never sent a third letter to his Federal Public Defender and several times went months without contact and being able to import and receive information as a result. Plaintiff will also mention here that he was not told by the jail when he was scheduled for an attorney visit. Plaintiff was therefore unable to prepare for these visits and usually only found out that it was an attorney visit after he had left his cell. When Plaintiff managed to have notes about his case they were usually left behind in Plaintiffs cell. Plaintiff also did not feel safe accumulating notes without a way to securly transfer them to his attorney. As some WCRJ prisoners would periodically get into and view a prisoner's legal papers, when that prisoner was indisposed or out of the cell, and as there is no "right to privacy" within a jail cell - which some guards take to mean they can read or relieve you of such legal papers - the only remaining way to prepare for and to have an effective and meaningful meeting with an attorney would be to send communication to them by mail - if it was a secure way to communicate.

51 Count Category Four (CC4)
The actions and policies described in Count Categories One, Two, Three and in previous paragraphs were and resulted in interference with Plaintiff's access to the courts and counsel in violations

51 (continued from previous page)
of Plaintiff's rights under the First, Sixth and Fourteenth Amendments
to the United States Constitution. Plaintiff's right to Free Speech, Free
Association and the right to receive and send mail under the First Amendment,
his right to counsel under the Sixth Amendment and his Due Process rights
under the Fourteenth Amendment were particularly violated. These violations were
under color of state law and in blatant disregard of Plaintiff's rights under
both the United States and Kentucky Commonwealth Constitutions as well
as the multiple state regulations and statutes described in Count Categories
One, Two and Three.

52 Additionally, as jail employees are public servants, and violation
of the laws, statutes, regulations and constitutional rights listed under
Count Categories One, Two, Three and Four occurred by jail employees
John or Jane Doe One, John or Jane Doe Two and Jailer Harmon in his personal
capacity, causing the violation of Plaintiff's rights of access to the
courts and counsel guaranteed by the First, Sixth and Fourteenth Amendments to the
United States Constitution and by the Kentucky Constitution, these jail employees also violated
KRS 522.020(b)(c) and KRS 522.030(b)(c) and thus a claim is made against
John or Jane Doe One, John or Jane Doe Two and Jailer Stephen Harmon in
his personal capacity under KRS 446.070.

53 Due to the duty owed Plaintiff by WCRJ employees under 501 KAR 3:140 et seq
and its originating and related statutes, and also that duty inherent in their position
as WCRJ employees, and the irreparable harm done Plaintiff by the resulting
violations of Plaintiff's right of access to the courts and counsel guaranteed by

53 (continued from previous page)
the First, Sixth and Fourteenth Amendments to the United States
Constitution as well as by the Constitution of the Kentucky Commonwealth,
Plaintiff additionally claims negligence by WCRJ employees
John or Jane Doe One, John or Jane Doe Two and Jailer Stephen Harmon
in his personal capacity.

54 Plaintiff's previously ardent desire to send much needed mail
to his attorneys and to the courts was completely chilled by the
necessity of such mail remaining confidential and by Plaintiff's
belief that-even if some communication got thru in one direction
or the other-there was no safe and private communication to or
with an attorney or the courts possible at WCRJ. This belief, based
on the actions of WCRJ employees John or Jane Doe One, John or Jane Doe Two,
Jailer Stephen Harmon and, simply reinforced by any possible actions of a
John or Jane Doe Three also caused Plaintiff to be unable to send any
mail describing elements of his case to paralegals while proceeding still as
prose and searching for an attorney for his state criminal case.
Without being able to send mail related to his criminal cases, Plaintiff could
not document any efforts he was making to contribute to his criminal cases
and could not impart and participate in defense strategy. Plaintiff could also not
document malpractice or ineffective assistance of counsel-which changed the entire
nature of the attorney-client relationship and left Plaintiff on a "runaway
train," while his attorneys developed defense strategy with no documented or significant
input from Plaintiff. Plaintiff additionally desired to send a letter to the court
requesting new federal counsel, but did not feel confident doing this by mail.

54 (Continued From previous page)

Additionally, without adequate written communication to a representing attorney especially to one who fails to follow thru with verbal requests, as in this case, and which can be confirmed with a notarized written record of what is sent, there is no true normal attorney-client relationship and thus no true access to the court, under these and many other similar burdening limitations.

55 Plaintiff never felt able to confidentially send a single letter to his state attorneys, and only once did they meet with the Plaintiff to discuss primarily, and not incidentally, facts of controversy in the case. Plaintiff had initially been wanting to try to find a private attorney for his state case, as none had been appointed for him during his first year as a pretrial detainee, but had to give that quest up due to an inability to communicate privately about the facts of the case with any potential representation, as they were not Plaintiff's "attorney of record" and Plaintiff's communication would be opened and read by Johnson Jane Doe One, John or Jane Doe Two or Jordan Harmon.

56 Communication by mail to Plaintiff's criminal attorneys would not necessarily have changed the ultimate outcome of the criminal proceedings and such is not being claimed in the instant case, but it would have alliviated the majority of the stress, anxiety, and intense mental anguish that was caused by two legal fights Plaintiff was engaged in and yet could not manage or significantly participate in. It would have also alliviated Plaintiff's feelings of hopelessness and extreme mental anguish that were caused by his lack of ability to influence the outcome of those case and granted him much more confidence in the outcome of those proceedings.

57 Plaintiff was also prevented in filing a conditions of confinement case against the jail he was held in previous to being at WCRJ by the chilling of his speech by John or Jane Doe One, John or Jane Doe Two and Jailer Stephen Harmon in his personal and official capacities, and their actions and policies described in Count Categories One, Two, Three and Four.

58 As Plaintiff's booking photo for each Facility will show, Plaintiff had no head injury when booked into The jail in the city of Jackson, Tennessee, but, when he was booked into WCRJ, the injury to Plaintiff's fore head was evident. This injury was caused by a John Doe jailer ignoring recklessly an excessive risk of injury after Plaintiff told the John Doe that Plaintiff had untreated glaucoma with darkened vision and large missing fields of vision in both eyes as well as double vision and blurred vision and that Plaintiff had to get up and down often to use the bathroom at night. Despite this, the John Doe jailer placed and left Plaintiff in a cell with no functioning light, and, as a direct result of this, Plaintiff fell and injured his head. As well, in full view of booking staff, an officer John Doe took Plaintiff's mothers wedding ring off of Plaintiff's key ring and said to the booking staff that he was taking it off to "send to his [Plaintiff's] attorney." Plaintiff's attorney, was only for his federal case, and claims he never received the ring and WCRJ property responses were that they did not have it in my property to their best determination. It now appears that the ring was kept by the officer, but its location is unknown. Proper and timely filing of the claim under Tennessee statute of limitations was lost after a year from March 10, 2021 and likely the ability

58 (continued from previous page)
to preserve jail video was lost along with it. This chilling of my ability
and desire to pursue this claim was brought about by the actions
and policies described in Count Categories One, Two, Three and Four
and carried out by John or Jane Doe One, John or Jane Doe Two,
and Jailer Stephen Harmon in his personal capacity and his official
capacity as jailer.

59 This hinderance and interference of Plaintiff's access to counsel and the courts
also prevented Plaintiff from filing the instant case while still at WCRJ, for
instance, for fear that confidential, non public communication between
Plaintiff and civil rights organizations and civil rights attorneys would be
intercepted and read and that the jail would gain an unfair advantage
by being an unmeant intermediary between Plaintiff and the attorneys
and Plaintiff and the Court. Additionally, the fact that the case has eventually
been filed does not erase the irreparable harm done to Plaintiff's First, and
Fourteenth Amendment rights, as many of the earliest violations of those
rights are now beyond the one year statute of limitations and claims for
damages can not now be pursued on those older claims absent court-ordered
tolling of the statute of limitations. Also, additional harm to Plaintiff resulted from
not being able to file the instant case earlier, as there were continuing violations.
This chilling of Plaintiff's ability and desire to pursue the instant case was brought
about by the actions and policies described in Count Categories One, Two, Three
and Four and carried out by John or Jane Doe One, John or Jane Doe Two,
and Jailer Stephen Harmon in his personal capacity and his official capacity
as jailer.

60. Under color of state law and in arbitrary and capricious violation of the First, Sixth and Fourteenth Amendments to the United States Constitution and of the Constitution of the Kentucky Common wealth, under color of state law Jailer Stephen Harmon in his official capacity as Jailer of WCRJ recklessly, unconstitutionally, unlawfully and knowingly maintained, continued, promulgated and enforced Warren County and WCRJ policies practices and customs described in Count Categories One, Two and Three such as: the arbitrary opening outside the presence of the prisoner-addressee of any mail not from that prisoner's arbitrarily-determined "attorney of record", including mail of Plaintiff's; the arbitrary opening of mail from public officials outside the prisoner-addressee's presence, including mail of Plaintiffs; the returning to the sender or destruction of censored mail without pre-deprivation notice to the prisoner-addressee and without opportunity to protest the return decision and to appeal to a neutral third party, including mail of Plaintiffs, for example, which directly caused chilling and hindered and impeded Plaintiff's access to his counsel and the courts and created unnecessary and arbitrary barriers to Plaintiff's exercise of his freedom of speech and association, his right to receive and send mail, his right to meaningful access to counsel and his access to the courts and due process.

61. Additionally, Jailer Harmon retaliated against Plaintiff for the exercise of his First Amendment rights and for Plaintiff's filing of a grievance concerning Count Category Two (public official mail) by telling Plaintiff in a grievance appeal response to not file additional grievances on the topic which chilled Plaintiff's

61 (continued from previous page)

speech and directly impeded his ability to use the grievance process.
Thus a claim of First Amendment retaliation is made against
Jailer Stephen Harmon in his personal capacity.

62 Count Category Five (CC5) Under color of state law and in direct violation
of the Fourteenth Amendment to the United States Constitution and of Plaintiff's right to free
speech, association and to send and receive mail and the Kentucky Commonwealth
Constitution, and resulting in a further chilling of Plaintiff's speech
as well as unlawful punishment of a pretrial detainee, Jailer Stephen
Harmon in his official capacity as jailer recklessly, knowingly,
unconstitutionally maintained, continued, promulgated and enforced
a Warren County and WCRJ policy of stomping all outgoing mail
from prisoners with a stamp reading "uncensored mail from an inmate."
This stamp was applied to all outgoing mail from pretrial detainees,
including that of plaintiff, and did not contribute to the jail's singular
lawful purpose of holding pretrial detainees for trial and was an
excessive arbitrary reaction to any safety or security concern. There
were a considerable number of de minimis alternatives which would have
mitigated or eliminated the harm to Plaintiff as well as other pretrial detainees
including: 1) only stomping mail sent to addresses within Warren County
2) stomping mail from pretrial detainees with the phrase "uncensored mail
from a pretrial detainee" 3) stomping mail from pretrial detainees simply with
the phrase "uncensored mail" 4) not stomping mail from pretrial detainees.
Out of these alternatives, Plaintiff believes that alternative Three (3) best balances
the interests of all involved. Plaintiff does not know if the lack of response

62. (Continued from previous page)

to his outgoing mail was all due to the actions of the previously mentioned John or Jane Doe Three but strongly believes that the lack of response he received when trying to wrap up or wind down his pre pretrial detainee affairs was due to the public's response to the word "inmate." The word inmate is too broad of a category and Plaintiff believes the use of this word when stamped on his mail, specifically to a non profit and to the Tennessee Department which was handling the information about Covid-19 relief money for apartment dwellers, caused a bias against his being able to participate in programs administered by those two groups and others. Additionally Plaintiff would rather send such a stamped letter to a million uninvolved strangers with whom Plaintiff was not needing to do business, than to a single place of business or individual Plaintiff must interact with to wrap up or wind down business while a pretrial detainee. Plaintiff believes the quite unhelpful letter he received from his bank when trying to access his funds to pay child support is one example of this. (Plaintiff will additionally note that the jail would not allow Plaintiff to receive a two party check - one addressed to both himself and his ex-wife - but sent it back to the bank with no notice to Plaintiff. Plaintiff would not trust a signed one party check to the mail at WCRJ, and so the child support was not paid.) Plaintiff did not feel comfortable damaging any additional relationships with acquaintances or previously encountered entities, and so held back from sending letters at a time when he should have had the freedom to accomplish tasks which would benefit him financially and in his transition to being

62 (Continued From previous page)

a prisoner and in preserving assets For his children's benefit.
Plaintiff did not have Family on the outside to help him.
If Warren County was indeed concerned about outgoing
contraband or the contents of letters, the jailer could have
offered a Fifth alternative, which would be to submit any
letter a prisoner did not want stamped, For searching and
scanning - or even reading. The Fact that none of these Five
demini mis alternatives was offered and the reactions and non reactions
to Plaintiff's outgoing mail and the resulting chilling oF Plaintiff's
speech made Plaintiff Feel harrassed.

63 Count Category Six (CC6)   Under color of state law, and
in violation oF the Eighth Amendment against cruel and unusual
punishments oF convicted prisoners and thus in violaton oF the Fourteenth
Amendment to The United States Constitution prohibition ogainst
the punishment oF pretrial detainees, and oF the Kentucky Constitution and in additional
violation of 501 KAR 3:140 et.seq. "Prisoner Rights" which sets a minimum For out-oF cell
exercise and which Rises to the level oF a Federally - protected liberty interest,
additionally in violation oF KRS 71.040, Jailer Stephen Harmon in his
official capacity as jailer oF WCRJ recklessly in disregard oF the
constitutional and lawFul rights oF Plaintiff and other pretrial detainees, knowingly
unconstitutionally, unlawFully maintained, continued promulgated and enForced
a Warren County and WCRJ policy practice and custom oF overcrowding
which deprived Plaintiff and other pretrial detainees oF a constitutional
amount oF exercise and out oF cell exercise, and outdoor exercise.

64.  Plaintiff and other pretrial detainees were not offered enough exercise to maintain physical and mental health. Plaintiff grew weaker and lost muscle mass as well as growing lethargic and had increasing trouble sleeping. The overcrowding was at first tolerable but, the later in the year 2022 it became, The worse it grew and the longer it had lasted. The overcrowding eventually became so bad that it was difficult to walk in the cell when most prisoners were awake and almost impossible for Plaintiff to sleep during those times. Typically the noise would not die down enough for plaintiff to sleep until around 2:30 AM and yet the bright overhead room lights come on at 6 AM. Plaintiff often had to try to sleep during the day, which caused him to have to choose between enough sleep and going to out of cell exercise or causing him to miss hearing the call for exercise entirely because he was asleep. After plaintiff's cell had been overcrowded for many months there were, at the time of one of Plaintiff's grievances, twenty-six prisoners in a cell with seventeen bunks, three beds of which appeared to have been added after the original construction of the jail. Plaintiff worked out the actual square footage of the cell and found it sufficient, by what he had researched were jail standards, for fourteen to fifteen prisoners. With several prisoners on the floor sleeping at times, it was difficult to walk for exercise in the cell, but the longest problem was the lack of attention given to getting prisoners out of the cell for exercise. Guards appeared to intentionally confuse exercise with "recreation." Plaintiff saw what appeared to be a full-court indoor basketball gymnasium that had been converted

64 (continued from previous page)

to house prisoners. Only one half-court exercise area was available for indoor use by prisoners for out-of-cell exercise for the entire jail—which Plaintiff believes means there is not enough indoor exercise space to give prisoners the constitutionally-required amount of exercise on weeks with inclement weather and not even enough to meet the standards of 501 KAR 3:140 et seq. Additionally the jail soon had stopped offering Plaintiff's cell occasional out-of-cell exercise on Saturdays and Sundays, so when the weather was bad on several days during the week, Plaintiff would often not be out of the cell often enough that week.

65 As the weather grew colder, and as the cell grew more and more crowded, Plaintiff was more and more often offered less than three exercise hours per week, culminating in his two grievances and grievance appeals about the issue. Had WCRJ attempted to at least average three hours per week, Plaintiff would have been satisfied, but Plaintiff finds the fact that he was only offered four hours (never five) of out-of-cell on one occasion in twenty-two months, to his best recollection, very telling. Plaintiff asserts that WCRJ should reduce the overcrowding until the full court gymnasium can be used as intended or that Warren County should build an additional indoor exercise area, to provide a long-term solution, and probably should do both.

66 In a grievance appeal response Jailer Stephen Harmon asserted that he has very little control over jail population. Plaintiff asserts however that there exists a Kentucky law which directs that Kentucky inmates eligible for "shock probation" are to be housed in a non-overcrowded facility, and that such inmates, however, were housed at WCRJ.

66 (continued from previous page)
Plaintiff additionally asserts that at least two Kentucky counties have previously engaged in legal actions to try to reduce overcrowding, and/or to increase payments from the State of Kentucky. Warren County has options.

67 Plaintiff asserts that the constitutional minimum for out-of-cell exercise under overcrowded conditions - especially for those which persist for extended periods of time, and are "long-term," such as existed at WCRJ and in Plaintiffs cell in 2022 and early 2023, is at least five to seven hours per week. Prisoners at Plaintiffs current facility receive access to comperable outdoor exercise areas between fourteen and seventeen hours per week, (Davidson County Sheriff office Downtown Detention Center) in an uncrowded medium - security cell.

68. Plaintiff additionally asserts that de minimis alternatives existed to indoor exercise in the single half court indoor exercise area, including taking prisoners to one of at least three under-used library areas to walk. Plaintiff found it difficult to get taken to the library as well, however, with the library in "H" pod, where plaintiff resided, oddly "closed" for the last several months Plaintiff was at WCRJ, and Plaintiff was only able to get taken to another of the libraries on one occasion despite many requests at the appointed time of 3pm "head count."

69 Plaintiff also notes that the section in 501 KAR 3:140 et seq Prisoner Rights which concerns exercise, also requires two of the three hours to be outside "weather permitting." Plaintiff also claims that Jailer Harmon in his official capacity as jailer and in his personal capacities, did not provide a constitutional minimum amount of "outside" exercise. Even during weeks with good weather, Plaintiff and Plaintiff's cell were oddly offered the "inside" exercise option more often than should have occured based on the ratio of one indoor to three outdoor exercise areas at WCRJ. Plaintiff believes that to be due to a WCRJ policy of exercise or "rec" rovers offering the less popular inside exercise option to Plaintiffs cell even when outside areas were available, at some time later in the day, in order to reduce the number of acceptances.

70 A claim is made additionally that in Jailer Stephen Harmon's individual capacity as supervisor that Jailer Harmon violated Plaintiff's First, Fourth, Sixth and Fourteenth Amendment rights, under the United States Constitution, his rights under The Privileges and Immunities Clause of Article IV of the United States Constitution, his rights under the Constitution of the Commonwealth of Kentucky, his rights under 501 KAR 3:140 et. seq. Prisoner Rights which is elevated to the level of a Federally-protected liberty interest and as described in originating and related statutes as well as violating KRS 522.020 (b)(c) and KRS 522.030 (b)(c), and (referencing and noting KRS 446.070) and knowingly Recklessly and negligently failed to appropriately discharge his supervisory duties as a public servant and that Failure directly resulted in denial of, deprivation of, and in irreparable injury and harm to Plaintiff's Federal constitutional Rights and those secured by the laws and Constitution of the Kentucky Commonwealth. Jailer Harmon had a supervisory duty, both imposed on him by law - as detailed above and in his responsibility as jailer to have current knowledge of case law, which is required of him by kentucky law - and inherent in his role as jailer and to act in a lawful manner by speaking to WCRJ employees to cause constitutional conduct and conduct which was lawful according to kentucky law and common law to occur.

71 Jailer Harmon in his individual capacity as supervisor Recklessly failed to properly train and supervise the employees of WCRJ and instead, actively approved, authorized, encouraged and indeed mandated the unconstitutional, unlawful and reckless conduct described in Count Categories One, Two, Three, Four, Five and Six,

71 (Continued from previous page)

while thus concurrently actively encouraging WCRF employees in their commission of KRS 446.070 thru KRS 522.020(b)(c) and KRS 522.030(b)(c) by violation of the United States and Kentucky Commonwealth Constitutions, 501 KAR 3:140 et seq "Prisoner Rights" and its originating and related statutes — and indeed while actively participating in Count Category One.

72 Proper training and supervision would have prevented the reckless, negligent, and negligent per se acts by WCRF employees described in Count Categories One, Two, Three, Four, Five and Six.

72 Plaintiff notes that due to the active role Jailer Hormon had in encouraging and mandating the conduct of WCRF employees who violated KRS 522.020(b)(c) and KRS 522.030(b)(c), an additional support of a claim under KRS 446.070 can be made for a violation of KRS 502.020(a)(b)(c) Complicity For Conduct of Another.

73 Plaintiff notes that there were only two small windows in his cell, neither one of which was transparent. Plaintiff went about a year without being able to see even a blade of grass or a tree before finally going out of the jail to court. WCRJ's "outside" exercise areas also do not provide any view of other than four walls, a mesh wire ceiling and possibly a cloud or the sun. Plaintiff asserts that pretrial detainees more often must reintegrate back into society after jail than convicted prisoners and that cutting Plaintiff and other pretrial detainees off from significantly "communing with nature" extendedly is a denial of a basic essential human need.

IV.   RELIEF

MONEY DAMAGES

Count Category One

John or Jane Doe One $200 Constitutional, $200 Negligence, $800 Negligence per se/KRS446.70
John or Jane Doe Two $200 Constitutional, $200 negligence, $800 Negligence per se/KRS446.70
Jailer Stephen Harmon, Official Capacity $4000
Jailer Stephen Harmon, Personal Capacity/Supervisor $800|negligence $200/Negligence per se $200

Count Category Two

John or Jane Doe Two $700 constitutional, $200 negligence, $200 Negligence per se/KRS446.70
Jailer Stephen Harmon, Official Capacity, $3000
Jailer Stephen Harmon, Personal Capacity/Supervisor $500

Count Category Three

John or Jane Doe Two $200 constitutional, $200 negligence per se/KRS446.70
Jailer Stephen Harmon, Official Capacity $4000
Jailer Stephen Harmon, Personal Capacity/Supervisor $800

Count Category Four: Access to Counsel

John or Jane Doe One $50 constitutional, $50 negligence, $50 negligence per se/KRS446.70
John or Jane Doe Two $100 constitutional, $100 negligence, $100 negligence per se/KRS446.70
Jailer Stephen Harmon, Official Capacity $20,000
Jailer Stephen Harmon, Personal Capacity/Supervisor $2000|negligence $2000/negligence per se $2000

Count Category Four: Access to the Court

John or Jane Doe One $50 constitutional, $50 negligence, $50 negligence per se/KRS446.70
John or Jane Doe Two $100 constitutional, $100 negligence, $100 negligence per se/KRS446.70
Jailer Stephen Harmon, Official Capacity $20,000
Jailer Stephen Harmon, Personal Capacity/Supervisor $2000/negligence $2000/Negligence per se $2000

Count Category Five

Jailer Stephen Harmon, Official Capacity $950
Jailer Stephen Harmon Personal Capacity/Supervisor $500

Count Category Six

Jailer Stephen Harmon, Official Capacity $3000
Jailer Stephen Harmon, Personal Capacity/Supervisor $800

Retaliation

Jailer Stephen Harmon, Personal Capacity $500

only other side is Finished, see court Form For punitive

IV    RELIEF

Punitive

CC1 Count Category One

John or Jane Doe One: constitutional $375 per letter, negligence $375 per letter, negligence per se $375 per letter

John or Jane Doe Two: constitutional $375 per letter, negligence $375 per letter, negligence per se $375 per letter

Jailer Stephen Harmon Personal Capacity:

constitutional $375 per letter, negligence $375 per letter, Negligence per se $375 per letter

per letter means per letter opened by that same defendant outside Plaintiff's presence

Jailer Stephen Harmon Personal Capacity / Supervisor $3000

CC2 John or Jane Doe Two:

constitutional $375 per letter, Negligence $375 per letter, negligence per se $375 per letter

per letter means per letter opened by John or Jane Doe Two outside Plaintiff's presence

Jailer Stephen Harmon Personal Capacity / Supervisor $2000

CC3 John or Jane Doe Two:

constitutional $375 per letter, negligence $375 per letter, Negligence per se $375 per letter

per letter means per letter Rejected with no predeprivation notice to Plaintiff

Jailer Stephen Harmon Personal Capacity / Supervisor $3000

## IV.    RELIEF

State exactly what you want the Court to do for you.  (If you seek relief which affects the fact or duration of your imprisonment (for example:  release from illegal detention, restoration of good time, expungement of records, release on parole), you must also file your claim under 28 U.S.C. §§ 2241, 2254 or 2255.)  The Plaintiff(s) want(s) the Court to:

_X_   award money damages in the amount of $ _see IV Relief, Money Damages page attached (2 sides)_

_X_   grant injunctive relief by _Declaratory_

CC4 access to courts $25 per letter listed in CC1, CC2, CC3 | For Does One and Johnson + Horman + CC4 access to counsel $25 per letter listed in CC1, CC2, CC3
Retaliation Horman $750 | For constitutional $375, for negligence $375 for negligence puns $375

_X_   award punitive damages in the amount of $ _↳ per letter in CC1, CC2, CC3 (Does One and Two and Horman)_

Individual capacity as supervisor Stephen Horman $3000, CC1, $2000 CC2, $3000 CC3, $2000 CC4 counsel, $8000 CC4 courts, $300 CC5, $500 CC6

_X_   other: _Any other relief that the Court decides is just and proper_

## V.    DECLARATION UNDER PENALTY OF PERJURY
   **(each Plaintiff must sign for him/herself)**

I, the undersigned, declare under penalty of perjury that the information contained in this document is true and correct.

This _20_ day of _March_____, 20_23_.

_Brian Nawson Smith_____
(Signature of Plaintiff)

_____
(Signature of additional Plaintiff)

_____
(Signature of additional Plaintiff)

I hereby certify that a copy of this complaint was delivered to the prisoner mail system for mailing on _3/20/23_ _available for pickup._

_Brian Nawson Smith_____
(Signature)

6